THE PEOPLE, *ex rel.* James McCune, *vs.* THE BOARD OF POLICE FOR THE METROPOLITAN POLICE DISTRICT.

The legislature, by the Metropolitan Police Act of April 15, 1857, intended to continue the then existing police in office, by virtue of their appointment under the act of April 13, 1853; and such policemen became, by the mere operation of the act of April, 1857, members of the metropolitan police.

And where a policeman, thus continued in office by the Metropolitan Police Act, although he refused to act under the new board of police, deeming the act of April, 1857, unconstitutional; and was unwilling and refused to act under it " until the courts should declare it constitutional," yet he continued to obey all general orders of the commissioners under the act of 1853, and, together with others acting with him, constituted the only police force of the 14th ward or precinct up to the 1st of July, 1857; *Held* that this conduct did not amount to a *resignation* of his office, but that he continued to be a member of the metropolitan police force.

*Held also,* that even if these acts of contumacy and refusal to act under the new organization were in themselves sufficient to constitute an intention to resign, the fact that the board of police, after the commission of such acts by the policeman, had recognized him as a member of the force, by instituting proceedings to have him dismissed for disobedience of orders, &c., and by adopting a resolution, on the 9th of October, 1857, declaring that such of the old force as had not been dismissed in conformity to law, were members of the metropolitan police, entitled to do duty, and to be paid as such, was proof that the resignation was never accepted by the board.

In order to constitute a resignation of an office, if there is no formal resignation there must be some conduct on the part of the incumbent which is actually inconsistent with the retention of the office, and a formal acceptance of the resignation, or the appointment of another in his place, by the proper authority.

Where, on the 23d of June, 1857, charges were preferred against the relator, a member of the metropolitan police, for disobedience of orders, and after proceedings were had thereon which were not in conformity with the 7th section of the Metropolitan Police Act, the board of police, on the 26th of the same month, without any formal notice to the relator, proceeded to dismiss and remove him from his office, and on the same day caused a notice of such dismissal and removal to be sent to the relator, which was never received by him; *Held* that the relator was not legally dismissed from his office; and that the proceedings had, for his removal, constituted no obstacle to the relief sought, by mandamus directing the board to restore him to pay and duty.

A person resigning an office, and manifesting the resignation by an unequivocal act, may retract or withdraw it, before the same is accepted, or any act is done to fill the place thus made vacant.

APPLICATION for a mandamus, to compel the board of police for the metropolitan police district to restore the relator to the office of patrolman, and to his pay as such. The application was resisted, on the ground that the relator was not a member of the police force. The facts in the case were found by a special verdict, and are detailed in the opinions which follow.

*J. C. Devereux* and *A. R. Dyett,* for the relator. I. The relator became, by operation of law, a member of the metropolitan police. (*Act of April* 15, 1857, *sections* 6; 7, 32, 33.)

II. Up to May 25, he had not resigned his place, refused to take or hold office, or publicly withdrawn from office as a policeman under the new act or the new board of police. (1.) The act of April 15, 1857, did not create a new police force for this city. It expressly continued the old force, with nearly the same powers and duties, but under a new direction, giving that direction the power to add to the number of the force only as allowed by the supervisors. (2.) Its repealing clause (§ 35) was contingent. It in terms repeals "all statutes," &c., "inconsistent with the provisions" of the act, and would have shared its fate had the act been declared unconstitutional. In that event the act was a dead letter; consequently the police law of April 13, 1853, is still in force and effect, and the new board "intruders and usurpers." (3.) The point in dispute, then, was as to which board had, by law, direction of the force. This was not *adjudged* till May 25, when the decision was rendered at general term. The appeal had been taken from an order at special term entered *pro forma*. (4.) Up to that date the relator continued to do regular patrol duty as an officer of the only police force in the ward. He was first notified June 18, as alleged by respondents, to report under the new act. Till the decision of general term, at least, he was a policeman under the metropolitan

police act, and had not resigned, withdrawn from or refused office.

III. The relator did not, after May 25, resign his place, refuse to take or hold office, or withdraw from office, under the new act or new board of police. (1.) He did not resign. He, in fact, was in the actual performance of patrol duty till July 3, and subsequently reported himself, and has since continually held himself in readiness for duty under the new board. No intention to resign his office of policeman is shown, and none can be inferred from any act of the relator. His hesitation related not to the office, or his authority as an officer, but to the authority of other officers under the new act. Resignation of office is the act of giving up, giving back or surrendering office, or a charge, in a *formal* manner. The intention must be explicitly made known. (2.) He did not refuse to accept office. The law conferred it upon him, April 15, 1857. The act of that date (§ 32) did not tender office to members of the old force, or leave them at liberty to become invested with it or not; but in terms continued them in office from the old under the new act. The old force did not cease to exist, or renew its existence, but continued on the same under the new act. There has been no time since April 15, when the new board could tender office to the relator, or the relator accept office from them, except since his alleged dismissal, June 26th, assuming that it was legally made, and at that date separated him from the police force. Acceptance necessarily presupposes the offer of something. (3.) He did not withdraw from office as patrolman of the new force. There was no withdrawal *in fact* on his part. An intention on the part of the relator to withdraw is not shown, and none is to be inferred, as a legal consequence, from his course subsequent to April 15. As an individual officer, he received no summons or notice of any sort from the new board. He was not even aware that his captain had been dismissed. The relator is to be held legally responsible only for his own acts, not for those of the old board of police, or

of its members, or for the conduct of the old force in the aggregate, except as he is shown to have assented to it.

IV. The rank and file of the old force is not to be held accountable for conduct those in authority saw fit to pursue, prior to July 3, as to the new act and new board of police, to which conduct they were not a party. As subordinates, they had no part in the official action of their superiors, the old commissioners and others, to originate or promote it, except merely so far as they acceded to the prudential purpose of maintaining their then organization *in statu quo*, till the constitutionality of the new police act had been ascertained.

V. The position of the old force, prior to July 3d, was provisional merely, and excusable. (1.) It was provisional. The old and new boards of police mutually disputed each other's right to govern and direct the force. The controversy was in actual litigation. All those whom subordinate members of the force had been accustomed to obey and adhere to—as the old commissioners, the chief of police, their immediate captains and officers; likewise the mayors of New York and Brooklyn, the common councils and officials generally of both cities, and the most eminent judges and counsel, favored with confidence the opinion that the new act was unconstitutional, and therefore a dead letter on the statute book. With such examples and advice, the subordinate officers naturally hesitated. At length, coerced on both sides, they assumed a position as nearly that of neutrality as was allowed them. Without deserting their officers, or interfering with the new board, they continued as they were, in the quiet performance of their duties, but only provisionally, pending the litigation. (2.) They acted under a species of *moral duress.* For that reason their action cannot be regarded as voluntary. They were constrained to assume their position. They did so after hesitation and unwillingly. A loss of employment and livelihood threatened them.

VI. The position of the old police was not that of rebellion to law. No opposition was at any time offered by it to the

organization or subsequent action of the new board of police. That force was a party to no tumults or disorder, but promoted good order and police in our city. When and as soon as the court of last resort pronounced, the old force yielded its ready assent to the judgment.

VII. The maxim *ignorantia juris non excusat* has no application to the provisional attitude of the old force, prior to July 3d. It was not a case of either ignorance or knowledge, but one of *mistake of the law*. (1.) That maxim, in its proper sense, is indeed a rule of legal and social policy, " without which crime could not be punished or wrong redressed ;" but the very idea of *excuse* implies delinquency, and hence the maxim may be invoked only where crime has been committed, wrong done, or a duty neglected. It is a perversion both of its language and spirit, to apply it to one who has done no wrong, &c. (2.) There is a clear and practical distinction between *ignorance* and *mistake* of the law. The former implies passiveness ; does not pretend to knowledge ; may be the result of laches, which is criminal ; is not susceptible of proof, as proof cannot reach the convictions of the mind undeveloped in action, and for that reason courts cannot relieve against it. Mistake in law, on the other hand, is generally as susceptible of proof as mistakes in a matter of fact. No one obtains credit for the pretense of being mistaken in relation to the general rules of property and common honesty, which he is necessarily taught by his intercourse with society. But every one does not understand the subtle and intricate distinctions of law. Lawyers are the professional advisers of the community. When the client is misled by them to make a contract, *or do an act against his interest*, the mistake is susceptible of proof. What higher evidence can there be of the fact of mistake than its development in overt acts ? " An actual mistake of the law, made with reference to the law itself, is distinguished from negative inattention. It is the difference between delusion and ignorance." (3.) Relief is given where the mistake is clearly one of law.

This doctrine is well established, and of application not merely to matters of contract. If a man, without any other motive or consideration than an erroneous opinion respecting his legal rights and obligations, releases a right, or undertakes to do any act, he is entitled to relief equally as if he had acted under a mistake of fact. Money paid for duties not imposed by law, with a knowledge of the facts, but under a mistake of the law—the party paying having the law in contemplation, and in good faith meaning to conform to it, but acting under a misconstruction, as ascertained by subsequent decisions—may be recovered back, as having been paid under the influence of the mistake. Its detention could be excused only on the ground of positive law. As a general rule, the same principle which furnishes a protection from loss, supplies also the remedy for a wrong, or the recovery of a right. The presumption is not, in any case, against a party acting in mistake of the law. (*Moses* v. *Macfarlane,* (*Ld. Mansfield,*) 2 *Burr.* 1002. *Farmer* v. *Arundel,* 2 *Wm. Black.* 825. *Bize* v. *Dickason,* 1 *T. R.* 287. *Hunt* v. *Rousmanier,* 8 *Wheat.* 215. 1 *Peters,* 1, 17. *Culbreath* v. *Culbreath,* 7 *Geo. R.* 70. *Lowndes* v. *Chisholm,* 2 *McCord's C. R.* 455. *Northrop* v. *Graves,* 19 *Conn. R.* 554. *Fitzgerald* v. *Peck,* 4 *Litt. R.* (*Kentucky,*) 125. *Underwood* v. *Brockman,* 4 *Dana's R.* 309. *Sturges et al.* v. *United States, Devereux's Court of Claims R.* 244, *and cases there cited.*)

VIII. The respondents, by their action in entertaining charges against the relator, June 18th, as a member of the metropolitan police force, subsequently trying him upon those charges and sentencing him, upon June 26th, thereon, to dismissal from his office as a member of such force, are precluded or estopped from availing themselves of clauses 1st and 2d of their return. Such acts were an acknowledgment that the relator was, on and after June 18th, a member of the metropolitan police under them, the respondents. (*Dezell* v. *Odell,* 3 *Hill,* 215.)

IX. Also, by their resolutions of Oct. 9, the respondents

are precluded from availing themselves of said clauses 1st and 2d of their return. Those resolutions were a condonation or act of forgiveness, and also an acknowledgment in terms, that members of the old force dismissed were, at the time of their alleged dismissals, upon the metropolitan police. The wording of the resolution does not admit of construction; its import, also, is too plain and obvious for that. Therefore, the subsequent resolution, of Dec. 2, rescinds or varies the former resolution, but does not affect its value or effect as a condonation and acknowledgment in favor of the old force.

X. The relator did not, at any time, take office or act under the ordinance of the common council of the city of New York, of June 2, 1857, for a day and night watch. The old force never in fact mustered under it, or became connected with it in any way or shape. There was nothing done under it. It was a dead letter, as the common council had no right to enact it. That ordinance was never enforced. No one could legally take office under it.

XI. The relator was not legally dismissed. To be legal, the dismissal should have been in accordance with the act of April 15, 1857, and the rules and regulations of the board, which were adopted under § 7 of the said the Metropolitan Police Act, and consequently have the effect of law. (1.) The charges were not duly made. They were not made to the board. They were not sworn to. The relator is not named in them. (2.) The trial was not duly conducted. Notice, as required by rule 7, to call and examine the charges, was omitted. The relator had no notice of trial, nor was an opportunity afforded him of being heard in his defense. The matter of the relator's removal was not heard at a regular meeting of the board. The sentence was not duly entered in the minutes, as required by rule 11, or a duplicate thereof served upon the relator.

XII. The relator was not so notified, tried and sentenced to dismissal for the purpose, as alleged, of making and procuring record evidence of his separation from the police force of

the metropolitan police district. Those proceedings were solely for the purpose of dismissing him as a member of such force.

XIII. There is no such thing as a "pay-roll of the metropolitan police." It is not required by the act, or said rules and regulations of the board.

XIV. On April 22, 1857, the respondents entered on their duties, and assumed control of the police force, including the relator. From thence they had full and exclusive jurisdiction, without appeal, of every class of offenses by members of the force. (1.) The act gives them a discretion as to the "cause" of removal. In that respect their duties are *quasi judicial.* (2.) The provision of the act, (§ 7,) that "no one shall be removed" from the force "except upon written charges," and after an opportunity shall have been afforded him of being heard in his defense," relates to respondents in a ministerial capacity solely. The giving such notice of trial is a ministerial act, and therefore the neglect of it subject to correction by mandamus. (3.) This court has not jurisdiction to determine whether the alleged offense of the relator was, in fact or law, a resignation of or withdrawal from office, or cause of removal therefrom.

*A. J. Vanderpoel, Wm. Curtis Noyes* and *D. D. Field,* for the defendants. I. The claim of the relator is resisted, upon the ground that he is not a member of the police. If he be not a member, it is clear that he is not entitled to act as a policeman, or to be paid as one. The board place their denial upon these grounds : (1.) That upon the organization of the metropolitan police, the relator did not become a member of it. His consent was necessary to the transfer from the city to the district police. That consent was not given, and therefore he never became a member. (2.) That if he did, by operation of the law, and without any previous consent, become *eo instanti* a member of the new force, he withdrew from it. His acts and his declarations show his election to

adhere to the old organization, and to array himself against the new order of things. (3.) That if he became a member, he was removed by the board.

II. The act of April 15, 1857, establishing a metropolitan police, undoubtedly intended to place the municipal police in the ranks of the metropolitan police, if they were willing to be placed there; but it did not transfer them against their will. It may be doubted, indeed, whether the legislature could do so. The office of metropolitan policeman is very different from that of municipal policeman. One is confined to New York, the other may be sent into any part of the four counties. Neither an office, nor a charter, or franchise, can, under our system, be forced upon one against his will. The only part of the new act which affects the question of the continuance of the old force, is the latter part of § 32 : " The police of the city of New York shall continue to do duty under existing laws, until the first meeting of the board of police, when the said police shall hold office and do duty under the provisions of this act, and as members of the police force of the metropolitan police district hereby constituted." This should be read as if the words, if they wish to continue in office, were inserted after the word police.

III. But whether the legislature could do this or not, and whether without any manifestation of intention one way or the other, the old police were incorporated into the new, it would seem quite clear that they were not required to remain against their will. The 12th section shows that a policeman's right to withdraw or resign, was not intended to be taken from him. The 6th section shows, also, that the board had a right to dismiss from the service without a trial; for, on a reduction of the number by the supervisors, the board must of necessity designate who are to be dropped. Therefore, whether on the instant when the board was organized, and before signifying their election to accept the new act by doing something under it, the municipal police became members of the metropolitan police, it seems clear that, if they did on the

instant become such members, they could still withdraw, or resign. They could do so without notice, and by acts as well as words. Accepting an incompatible office was always held to be an election not to continue in a former one. (2 *Hill*, 92.) Resignations need never to have been in writing, unless especially so required by statute. (1 *R. S.* 122. 3 *Hill*, 243. 11 *Barb.* 90.) Here the relator's intention was manifested by unequivocal acts.

IV. If the relator, notwithstanding all that he said and did, nevertheless became and continued a member of the metropolitan police, he was removed by the board. There is an order of removal regular on its face. The board had the power to remove. They here intended to exercise the power. If they had not done so, it was because of the want of one of two prerequisites—one, a charge on oath ; and the other, service of notice of trial. But there was no defect in either. The charge was by an acting inspector, and the notice was sufficiently served. (1.) It was left at the place of residence and business of the relator with his superior officer. (2.) The conspiring between the relator and his superior officer prevented personal service. The relator cannot thus take advantage of his own wrong. (11 *Pick.* 7.)

CLERKE, J. The relator was duly appointed and sworn in, as a policeman, pursuant to the act passed April 13, 1853, entitled " An act in relation to the police department in the city of New York ;" thereupon he received his warrant as a member of the said police ; which was in due form, and was signed by the then existing commissioners of police. In conformity with this appointment he continued to perform duty as a policeman under the said act, attached to the 14th ward patrol district, until the act passed April 15, 1857, entitled " An act to establish a metropolitan police district, and to provide for the government thereof," went into effect. The relator acted under the orders of Daniel Kissner, who was in command of the said patrol district, from the time he became a

The People *v.* The Board of Police, &c.

member of the police until the said 15th of April, 1857, and continued to act under the same orders and in the same district, until July 3d, 1857.

The relator, following the example, and obeying the commands, of Kissner, his captain, did not recognize the metropolitan board of police, and refused to act under them, continuing to obey all general orders that issued from the commissioners under the act of 1853. Kissner and the relator, deeming the act of 1857 unconstitutional, refused to act under it, until the courts should declare it constitutional. They considered the act of 1853 still in force, and claimed to act under it, until the 3d of July, 1857.

The members of the old force, under the command of Kissner, including the relator, performed the police duty of the 14th ward until the last day of June, or 1st of July, 1857, and constituted the only police force on duty in that ward. The relator has performed no duty as a policeman since July 3d, 1857; but since that time has reported himself for duty, and has held himself in readiness for duty, as a member of the metropolitan police force. He received his pay from the comptroller of the city of New York to June 26th, 1857.

About said 26th of June, 1857, after the organization of the metropolitan police force, proceedings were instituted against the relator on the complaint of Sergeant Williamson, who, under the new organization, had the command of the 14th precinct, comprising, if not identical with, the district to which the relator had been assigned for duty under the late organization. He was accused in this complaint before the new board, of willful disobedience of orders, and insubordination; and the board taking cognizance of the charge, dismissed him, together with several other patrolmen, from the service of the department, for similar alleged delinquencies. The question arising on this state of facts is, whether the relator was a member of the metropolitan police force on the 11th of December, 1857, when the writ of alternative mandamus was issued in this case; and, in order to answer this question

correctly, it will be necessary to consider in the first place, whether the police, appointed under the act of 1853, became by the mere operation of the act of 1857, members of the metropolitan police force ; and secondly, if they did, do the acts of contumacy and refusal to act under the new organization until the 3d of July, 1857, amount to a resignation, on the part of the relator, of his membership in the new force; and thirdly, if they do not amount to this, but merely constitute acts of disobedience and insubordination, has he been dismissed in the proper way, and by the proper authority, from the service of the department.

    I. Did the police, appointed under the act of 1853, become by the mere operation of the act of 1857, members of the metropolitan police ? The 32d section of the new act provides that " the police in the cities of New York and Brooklyn, officers and patrolmen, shall continue to do duty under existing laws at the passage of this act, and, according to the regulations of the departments of New York and Brooklyn, until after the first meeting of the board of police, under this act ; when the said police shall hold office and do duty under the provisions of the act hereby enacted, and as members of the police force of ' the metropolitan police district' hereby constituted." This act contains no provision requiring any affirmative action or specific course of conduct on the part of the members of the old force, to qualify them for duty and membership under the new. They are to *continue* to do duty under existing laws ; and after the first meeting of the new board of police, they shall hold office and do duty under the provisions of the new act. This is all. There is no interruption for an instant in their capacity to exercise duties as police. The act, as we have seen, was passed on the 15th of April, 1857 ; it went into effect *immediately;* and the police were as effectually in possession of all the powers of their office the instant of the passage of the act, as the instant before. The new act does not enumerate the specific powers and duties of patrolmen : these are contained in the act of 1853, which,

to a certain extent, remains in force. It is a mistake to suppose that that act is absolutely expunged from the statute book, for it is only those parts and provisions of it, which are inconsistent with the new act that are repealed. The powers and duties, then, prescribed by the act of 1853, or any other law, are continued by the new act; and the officers and patrolmen are expressly authorized to exercise and perform them; and being thus authorized, without the intervention of any new appointment, without the requirement of any new or additional qualification, and without any abeyance or restriction whatever, they are transferred to the new organization, and are declared to be members of it.

It is plain to my mind, from these considerations, that in changing the organization of the police in some respects, and in providing for it a new governing and superintending body, and in extending the territorial sphere of its duties, the legislature never contemplated the creation of a new force; but, on the contrary, they deliberately intended the continuation in office of the men who composed the old police. They, indeed, required by section 33 that its members should possess certain specific qualifications, recited in section 7; not absolutely declared indispensable by any previous act; but, the language of section 33, requiring the possession of these qualifications, shows, distinctly, that nothing additional to what was before required was necessary to make the members of the old force, by the operation of the statute, members of the new; for it says "the board of police shall *remove* from office any one of the present members of the police departments of New York and Brooklyn, not possessed of the qualifications set forth in section seven of this act." They certainly could not be removed from office, for the want of these qualifications, unless they continued in office, whether they possessed them or not. The new act, therefore, did not vacate or abolish the office of the existing police, but, only rendered them liable to be removed, if it should be ascertained, by the new

board, that they did not possess the qualifications prescribed in section seven.

If they did not intend that the members of the old police should be continued in office, by force of the old appointment, the only alternative, then, is to suppose that they designed the creation of a new force; they (the legislature) appointing the members of the old force members of the new, and thus, of course, requiring some affirmative action on the part of those members, to signify their acceptance of the new office, such as being sworn in, &c. But are we to presume that the legislature usurped an authority, which the constitution has not conferred on them? The legislature are invested only with power *to make laws*, except in a few specific cases. It is doubtful, whether, under the present constitution, they have power to make any appointments to office, except to select their own officers and servants, and to choose senators to the senate of the United States—a duty imposed on them by the federal constitution. In certain cases (*see art.* 10, § 2 *of the state constitution*) they may *direct* the manner in which certain officers may be elected or appointed; but they, themselves, have no authority to elect or appoint. They have no more right to do this than to assume executive or judicial functions, and like the long parliament in the time of the commonwealth in England, or the national convention of the first revolution in France, absorb the whole powers of government, now happily partitioned into three distinct and co-ordinate branches, equal in power and dignity within their respective spheres. It is, therefore, manifest that the legislature, by the act of 1857, intended to continue the then existing police in office, by virtue of their appointment under the act of 1853.

It remains for us to consider whether, being in office after the passage of the act of April 15, 1857, they either duly resigned, or were duly dismissed; for, in no other way could their places be deemed vacant, except by the intervention of death.

II. Did they duly resign? I use the word resign synony-

mously with "withdraw." In section 12 of the act of 1857, they are used as equivalents. This section provides that "no member of the police force shall *withdraw* or resign from the force, unless he shall have given one month's notice thereof in writing, &c." So that, in this act, the word "withdraw" has not the meaning given to it by Lord Somers, in his speech delivered in 1688, when King James the 2d vacated the throne. In that speech he makes it equivalent to *desert,* "which in the common acceptance, both of the common and canon law, doth signify only a *bare withdrawing, a temporary quitting of a thing,* and neglect only; which leaveth the party at liberty of returning to it again." If the relator has only *withdrawn,* in this sense, he is not, on this ground, yet out of office—he has quitted it only temporarily; but it is very different if he has *resigned.* Did the relator then resign? I do not think that a formal notification of an intention to abdicate an office is necessary to constitute a legal resignation. Lord Somers, on the important occasion to which I have referred, says: "The word *abdicate* doth naturally and properly signify entirely to renounce, throw off, disown, relinquish any thing or person, so as to have no further to do with it; and that whether it be done by express words, or in writing, or *by doing such acts as are inconsistent with the holding and retaining of the thing.*" And to prove that it is sufficient, in order to constitute abdication or resignation, to do an act inconsistent with the retaining of it, though there has been nothing of express renunciation, he quotes from *Calvin,* from *Grotius, De Jure Belli et Pacis, lib.* 2, c. 4, § 4, *Lexicon Juridicum,* and from other jurists. But, nevertheless, whatever may be the manner by which the incumbent of an office indicates his intention of resigning or abdicating it, whether by acts inconsistent with the retention of the office, or by a formal renunciation of it, it is never consummated—he is never legally out of office—until his resignation is accepted, either expressly or by the appointment of another in his place. Otherwise an unworthy person, guilty

of the most flagrant violation of his duty, could, by a voluntary resignation, in many cases escape a trial, and the deserved ignominy of a dismissal. In the case of *Rex* v. *The Mayor of Ripon*, (4 *Salk.* 433,) the mere declaration, by an alderman, that he would hold the place no longer, was a good resignation, only because the corporation accepted it, and chose another in his place; and, until such election, it was declared that he had power to waive his resignation, but not afterwards. An ecclesiastical office must be resigned by the incumbent, to his superior, as a parson to the bishop, a bishop to the archbishop, an archbishop to the king, as supreme ordinary. And it is entirely in the discretion of the authority to whom the resignation should be made, either to accept or refuse it. "As the law has declared him the proper person to whom it ought to be made, it has likewise empowered him to judge thereof." (*Cro. Jac.* 64, 198.) With regard to the abdication of King James the 2d, it was held, in fact by most lawyers, that the throne was not legally vacated; it was contended by many, that it was a mere *desertion;* but by others his withdrawal from the kingdom was considered an act inconsistent with his retention of the high office; and parliament, by declaring the throne vacant, accepted this constructive resignation. But the truth is, it was not necessary—it was supererogatory at such a juncture— to consider its legality. The expulsion of King James, and the appointment of King William in his place, were not legal, but revolutionary events.

We thus perceive that in order to constitute a resignation, if there is no formal resignation, there must be some conduct on the part of the incumbent actually inconsistent with the retention of the office, and a formal acceptance of the resignation, or the appointment of another in his stead, by the proper authority.

It is not pretended that the relator presented a formal resignation. Did he commit any act inconsistent with his retention of the office ?

He refused to act under the new board, but "continued to obey all general orders of the commissioners under the act of 1853." He deemed the act of April 15, 1857, unconstitutional, and was unwilling and refused to act under it; "*until the courts should declare it constitutional.*" This was a very mistaken course of conduct, undoubtedly; it was contumacious and disorganizing, and in every respect highly reprehensible. But it is evident that the relator, nevertheless, never contemplated the abdication of his office. He continued to act as policeman; he, with others pursuing the same course of conduct, were the only persons who composed the police force of the 14th ward or precinct; and he and they distinctly stated that they only refused to act, "under the new board," until the courts should declare in favor of the new act. This was not even a desertion of the office, but a continuance of it; a continuance, to be sure, marked with disobedience to legitimate superiors, distrusting, if not ignoring their authority. But it would be offering violence to language, and to the legal signification of the word, to call his conduct a *resignation.* We have seen that in order to make a resignation complete, an acceptance of it, in some form, is indispensable. But even if those acts of the relator were in themselves sufficient to constitute an intention to resign, the defendants, so far from accepting his resignation, after the commission of those acts, recognized the relator as a member of the force. On the 23d of June, 1857, they instituted proceedings in order to have him dismissed, on the ground of disobedience to orders, and for insubordination, and on October 9, 1857, resolved that such of the old force as had not been dismissed, in conformity to law, were declared to be members of the metropolitan police, entitled to do duty, and to be paid as such; and although this resolution was afterwards rescinded, its effect as a recognition of the relator at the time it was adopted, is not impaired. It still remains a positive proof that the conduct of the relator, if ever amounting to a resignation, was never accepted, as such, by the defendants.

The relator remains, by the operation of the act of 1857, a member of the police, and never having done any thing, which constituted a legal resignation, and the defendants never having done any thing which amounted to an acceptance of his resignation, if he had resigned, the only remaining question is,

III. Was he legally dismissed ? The circumstances relating to the dismissal in this case are so similar to those presented in the matter of Richard Gambling, that it is unnecessary to prolong this inquiry by any minute examination of this point. It is enough, briefly to state that the proceedings were not in conformity with the 7th section of the new act, and the rules and regulations of the board. The charges were not duly made ; the relator never received notice of trial ; and, consequently, an opportunity was never afforded to him of being heard in his defense.

We therefore unanimously agree that the judgment below should be reversed, and that there should be judgment for the plaintiff.

DAVIES, P. J. The relator claiming to be a policeman of the metropolitan police district, prosecutes this writ to be restored to the office of patrolman, alleging that the defendants, without just cause, have deprived and continue to deprive him of that office.

The facts found by the special verdict, important to be considered are, that the relator was appointed a policeman under the act of 1853, took the oath of office and was acting as such policeman at the time of the passage of the act of April, 1857. That he did not, prior to July 3, 1857, recognize the defendants as having control of the police force, and refused to act under them prior to that date, but continued to obey the general orders emanating from the commissioners of police, under the act of April, 1853. That he was of the opinion that the act of April, 1853, continued in force, and claimed to act under it till July 3, 1857. That David Kissner was captain of the police of the 14th ward at the time of the re-

lators appointment, and that he continued to act under him till July 3, 1857, when he was first informed that Kissner had been removed by the defendants as such captain, and that on that day he reported himself for duty to the defendants, and has held himself in readiness ever since for duty as a member of the metropolitan police force; that the relator did duty as a policeman under the command of Captain Kissner, up to July 1, 1857, and that he and those acting with him were the only police force on duty in the 14th ward up to that time; that on the 23d of June, 1857, charges for disobedience of orders were preferred to the defendants against the relator, and on the 26th of June, 1857, the defendants, without any personal notice to the relator, proceeded to dismiss and remove him from the department, and on the same day notice of such dismissal and removal was sent to the relator by the chief clerk of the defendants, but was never received by him.

We have disposed of the question of the validity of the proceedings of the defendants, for the removal and dismissal of the relator, in the case of *Gambling and others*, decided at this term.(*a*)   It is therefore sufficient to say that such attempted removal and dismissal present no obstacle to the relief which the relator seeks by this proceeding.

It is contended on the part of the defendants, that the acts and conduct of the relator after the passage of the act of April, 1857, evince a determination not to accept office under that act, and that such conduct and acts are equivalent to a resignation of the office; that it was not in the power of the legislature to compel him to accept an office against his will, and therefore he must be deemed as declining it.

We think a review of the position of the relator at the time of the passage of the act of 1857, and his conduct since, furnish a solution of the difficulties suggested.   The act of April, 1853, created the office of policeman.   To that office the relator was appointed in 1854, and which office he was entitled

(*a*) Ante, page 481.

by law to hold during good behavior, subject only to be removed in a legal manner for cause. The act of 1857, so far as it affected the relator, created no new office ; it only superadded new duties to the office he then held, and declared he should continue in office and discharge those new duties. If he refused to obey the new authorities who were placed in control of the department, such refusal would subject him to trial and removal from office. We do not see how in any just sense the increasing the duties of an officer, in office, can be said to create a new office, and if he shall neglect to discharge any of these superadded duties, it can be justly said he declines to accept the new office. We do not see any new office created to accept or decline. But it is apparent from the special verdict that the relator never contemplated a declinature of the office of a policeman. He had accepted the office and was engaged in the discharge of its duties, at the time of the passage of the act of 1857. Instead of declining to execute these duties, the special verdict finds that he continued to discharge them, and received pay therefor up to July, 1857, at which time he tendered a discharge of the same duties to the defendants and has ever since been ready to do duty under their direction. These acts certainly do not, in our judgment, bear the construction claimed by the defendants, that the relator evinced a purpose to relinquish the office of a policeman. On the contrary, we infer from them, a settled determination on his part to retain the office, but to look for orders only to the source from which he had so long received them, until it was judicially established that the defendants were the legal controlling authority of the force.

If the relator refused to obey the orders of the defendants, for that offense they had and have the power to inflict ample and speedy punishment. It is to prefer charges according to their rules, and legally remove him from the department. But we think the commission of an offense, while acting as a policeman, which would constitute a good cause of removal,

The People v. The Board of Police, &c.

cannot be said to amount to a refusal to act in the office, or evince a settled purpose to decline it absolutely.

We think the acts of the defendants themselves, show that they did not regard the relator as having refused to continue in the office of a policeman. If he was not a policeman, why proceed to prefer charges, go through the form of a trial and give judgment of removal and dismissal? We think they properly treated the relator as a policeman in June, 1857, and if the proceedings for his removal and dismissal had been in conformity to law, so that they acquired jurisdiction over him, such proceedings would have terminated his connection with the department.

It was further contended that if the relator was a policeman and became a member of the metropolitan police, as we have held he did, yet that he could withdraw or resign. It certainly is true that this could be done, but it must be a withdrawal from, or resignation of, the office of policeman. A mere withdrawal or refusal to act under the authority of the defendants while continuing to discharge the duties of the office, cannot, we think, be said to be a withdrawal from the office, but amounts only to a disobedience of orders. It is quite true that the relator could at any time resign the office, and such resignation might be by words as well as acts. It must however be a resignation of the office; a neglect or refusal to discharge a portion of the duties of office, cannot, we think, be regarded as a resignation of the office itself.

To illustrate this point with the case put on the argument. The act of 1853 made it the duty of the mayor, recorder and city judge to act as a board of police commissioners. The recorder of the city acted as a police commissioner under this act till about December 1, 1856, when he declined, for reasons, no doubt, quite satisfactory to himself, to discharge any further duties as police commissioner. He continued to discharge the duties of recorder till the expiration of his term of office, Dec. 31, 1857. We think it would be equally as plausible to argue that he resigned the office of recorder because he de-

clined to discharge these duties, as it is to maintain that the relator resigned his office as policeman because he did not recognize the defendants as the head of the police force. Again : the act of 1857 constitutes the mayor of New York one of the board of police organized by that act. It became the duty of the mayor of New York, on the passage of that act, to discharge these duties and act as a member of the board of police.

It is well known that the mayor of this city did not assume the duties thus imposed on him until a period later than that at which the relator tendered his service to the defendants. Would it not be most unsound to say that the mayor by such refusal and neglect resigned or withdrew from the office of mayor ? We think so, and can see no difference in the case suggested and the one under consideration. But suppose these acts are to be regarded as a resignation by the relator of his office of policeman, have the defendants accepted the same, or done any act precluding the relator from withdrawing such preferred resignation ? We think not. We regard their proceedings in June, for the removal and dismissal of the relator, as a recognition of his status as a policeman, and the adoption of the resolution of October 9th as a full recognition of all the policemen, including the relator, who had not been legally removed, as members of the metropolitan force.

We understood it to be conceded on the argument that a person resigning an office, when such resignation is manifested by an unequivocal act, might retract or withdraw it, before the same was accepted, or any act done to fill the place made vacant by such resignation. The case of *The Mayor of Ripon, (Siderfin's Rep.* 14,) is an authority for this position.

In the present case the defendants never took any proceedings importing that they regarded the relator as having resigned his office, nor proceeded to fill the vacancy, but on the contrary, as we have seen, treated and recognized him as in office. Since the 3d of July the relator has done no act

evincing a disposition to resign, but on the contrary a determination to retain the office and discharge its duties.

We are all of the opinion that upon the facts found by the special verdict, the relator has been a policeman since his appointment in 1854, and is entitled to do duty as such, and that judgment must be given for the people, and the writ of mandamus as prayed for issue.

SUTHERLAND, J. Considering all questions as to the legality or regularity of the relator's dismissal or removal from the police force of the city of New York, on or about the 26th day of June, 1857, by the board of police, as disposed of in his favor by our decision, at this general term, in the cases of Gambling and others; the only question in this case, which I shall examine, is whether the conduct of the relator, subsequent to the passage of the metropolitan police act, in continuing to act under and to obey orders from the old commissioners, under the act of April 13, 1853, down to July 3, 1857, when informed of the decision of the court of appeals, declaring the metropolitan police act to be constitutional, forbid him, as one of the police, suing out this mandamus; or in other words, whether his conduct and position, as a member of the old force, after the passage of the metropolitan police act, until July 3, was incompatible with his claim to be a member of the metropolitan police force, when he sued out the writ in this case.

The special verdict in this case finds that the members of the old force, including the relator, under the command of Captain Kissner, did the police duty of the fourteenth ward, up to the last of June or first of July, 1857, and *were the only police force on duty* in the fourteenth ward; that Captain Kissner was acting, down to July 3, 1857, under the orders of the commissioners appointed under the act of April 13, 1853; that on July 3, 1857, Captain Kissner stated to the men acting under him, that the metropolitan police act of April 15, 1857, had been declared constitutional by the

court of appeals, and advised them to report themselves to the metropolitan commissioners; and asked them to give up the city property, the caps and stars they had in their possession; that the relator then and there surrendered his cap and star; that the relator has done no duty .as a policeman since July 3, 1857; but since then *reported himself for duty, and has held himself in readiness for duty, as a member of the metropolitan police force.* The acts and conduct of the relator, claimed by the respondents to be incompatible with the relator's claim to be a policeman when he sued out the writ in this case, are therefore to be looked for on and prior to the 3d of July, 1857.

What were these acts, and what was this conduct of the relator, as found by the special verdict? That the relator and Captain Kissner did not recognize the metropolitan board of police, and refused to act under the said board, but continued to obey all general orders that issued from the commissioners under the act of April 13, 1853; and said Kissner made his daily returns to George W. Matsell, chief of police, down to July 3, 1857. That said Kissner and the relator each deemed the act of April 15, 1857, unconstitutional, and refused to act under it, till the courts should declare it constitutional. They were of opinion that the act of April 13, 1853, continued in force; and claimed to act under it to the 3rd day of July, 1857. That the relator acted with a body of several hundred men, who belonged to the police of the city of New York, under the act of April 13, 1853, and who continued under that organization, as distinguished from the metropolitan police, organized under the act of April 15, 1857, up to the 3d of July, 1857. These are the material facts found by the special verdict, and relied upon by the respondents, as showing that the relator had publicly withdrawn from the police force established under the act of 1857, and had resigned his office before he sued out this writ, as a policeman; and as inconsistent with a right as a policeman, under the act of

1857, to sue out this writ. David Kissner was captain of the police force of the fourteenth ward of the city of New York, and the relator one of the police force of that ward, acting under him, when the metropolitan police act was passed. That act was thought to be unconstitutional, and its constitutionality was being contested in the courts. Up to July 3, 1857, when the act was decided, by the court of appeals, to be constitutional, Captain Kissner and the relator did not recognize the new metropolitan board of police, but until then, Captain Kissner continued to obey and act under the orders of the old commissioners in office under the act of 1853, when the act of 1857 was passed; and the relator continued to act under the orders of Captain Kissner; but *both actually did police duty, down to about the first of July;* and the police force of the fourteenth ward, including the relator, in office when the act of 1857 was passed, acting under Captain Kissner, *were the only police force in that ward, up to about July* 1, 1857.

The general duties of a policeman, as a conservator of the peace, as prescribed by the act of 1857, so far as they are prescribed by that act, are the same as those prescribed by the act of 1853, under which Kissner and the relator were appointed, and were acting, when the act of 1857 was passed. The police force to be appointed by the new board of police, under section 6 of the act of 1857, was, in words, to be a "police force for the whole of the metropolitan police district, and authorized to do duty in any part thereof, without regard to residence or county lines." The relator was not appointed, and he does not claim to have been appointed, at any time, by the new board of police; but he claims to have been continued in his office, and to have been a member of the police force of the metropolitan police district when he sued out the mandamus in this case, by section 32 of the act of 1857, the last clause of which is: "The police in the cities of New York and Brooklyn, officers and patrolmen, shall continue to do duty, under existing laws at the passage of this act, and ac-

cording to the regulations of the departments of New York and Brooklyn, until after the first meeting of the board of police, under this act, when the said police shall hold office, and do duty under the provisions of the act hereby enacted, *and* as members of the police force of the 'metropolitan police district' hereby constituted." Conceding that this continuation of the then existing police force in office gave the members of it the authority to do duty in *any part* of the "metropolitan district," and the powers of constables in every part of the state, given to the members of the police *to be appointed* by the new board of police, by sections 6 and 8 of the act of 1857, yet the police duty and powers, the sphere of which was so extended, *were the same police duty and powers they were then, when so continued in office, performing and exercising,* and were bound and authorized to perform and exercise in the cities of New York and Brooklyn only. The members of the old police were, by the act of 1857, continued in office, with all their official powers and duties, under previous laws, with the additional right given to them, and the additional duty imposed upon them, by the act of 1857, of exercising and performing those powers and duties in any part of the metropolitan police district, when detailed or ordered so to do, by the new board of police. The members of the old force were not to take any new oath of office, or to do any other act or thing, to make them members of the police force of the "metropolitan police district." By the clause of section 32, above quoted, they " *shall continue to do duty,*" under laws existing at the passage of the act, etc. until after the first meeting of the board of police, under the act; '*when they shall hold office and do duty,*' under the provisions of the act of 1857, as members, etc. That act does not extend to them the privilege of accepting office under the act, but *continues them in office and makes them members* of the metropolitan district police force, without requiring a single act or declaration showing their assent. By section 12 they had no right to withdraw or resign without giving one

month's notice to the general superintendent. In looking at the operation of the act of 1857, as to the then existing police force, to say that that force was by the act *transferred,* is not, it appears to me, a correct expression. They were *left* in office by the act of 1857, and new commissioners and a new general superintendent put over them by the act; and they were made liable, by the new act, to be sent out on duty into any part of the four counties comprising the "metropolitan police district." The old force were put under new officers, and were to obey their orders, and, when required, to do duty in any part of the four counties—but did this make them *new officers?* It appears to me that their then office was not abolished by the act, and they transferred to a new office, but that they continued to hold the same office after the new act, and after the first meeting of the new board of police, as before, with their official functions and duties somewhat extended.

The special verdict finds that the members of the old force, including the relator, under Captain Kissner, did the whole police duty of the 14th ward up to about the 1st of July, 1857. It does not appear, and there is no complaint that the duty, so far as the public peace and interest were concerned, was not as well performed in that ward after as before the metropolitan police act. There is nothing from which it can be inferred that the relator did not peform the same duty after, as before, that act, or that he would have performed, or would have been required to perform, any different duty, had he and Captain Kissner believed that act to be constitutional, and had recognized the authority of the new board of police. It does not appear that the relator was ever detailed or ordered by the new board of police, or their general superintendent, to do duty out of the 14th ward. It is not pretended that the relator, or any of the old police of the 14th ward, refused to obey any order of the new authorities, other than to report themselves for duty at 88 White street, or that any other specific order was issued to them by such n w authorities. The fact found by the special verdict,

that *the relator and Captain Kissner refused to act under the metropolitan board of police,* must be taken to be an inference or conclusion from the facts, that they deemed the act of April 15, 1857, unconstitutional, and did not recognize the metropolitan board of police, but continued to obey all general orders that issued from the old commissioners under the act of 1853.

It is not questioned that the relator, on due notice and upon written charges, and according to the rules and regulations of the new board and the act, might have been removed from his office, in which he was continued by the act of 1857, by the new board of police, for not reporting himself for duty to them, or for disobedience of any other supervisory order or regulation the board were authorized to make. But the question is, whether the relator's continued recognition of the old commissioners, and of their authority after the act of 1857, while continuing to do the same police duties, of his office, before and after the act of 1857, forbids his legal recognition as a member of the police force of the "metropolitan police district" at any time ; or if, by the clause of section 32, above given, he is to be recognized as a member on the passage of the act, whether his subsequent recognition of the authority and orders of the old commissioners, while continuing to exercise and perform all the functions and duties of his office as policeman, changed or affected his office or position, so that it can be said that his office and position became incompatible with his continued recognition as a member of the police force of the "metropolitan police district," and that he *thus* ceased to be a member without resigning or being removed. The whole argument of the counsel for the respondents on this point appears to have originated and proceeded on the idea that the old existing police force, by the operation of the act of 1857, became different officers, and held different offices from what they were and had before ; and that the relator's office of policeman depended upon which of the authorities he recognized—the old or the new. I think the relator was the

same officer, and had the same office, after the act of 1857, as before, and whether he recognized the old or the new commissioners. He was continued in office by the act without his consent, and could have been removed under the act, for cause. But *until removed,* no idea or belief of his of the unconstitutionality of the metropolitan police act, or recognition of the old commissioners rather than the new, could change or affect his own office. Notwithstanding his acts and conduct set forth by the special verdict in this case, he continued to be a policeman of the 14th ward, and a member of the police force of the "metropolitan police district" within the meaning of the act of 1857. And it seems that the respondents thought so too, for their attempted removal of him from that force on the 26th of June, 1857, necessarily implied that he was then a member of that force. It appears to have been the main purpose of the metropolitan police act, to put over the whole body of the old police force then existing, new officers; whether for the better government of the city, or for the political welfare of the members of that force, is immaterial. It might be conceded that policemen *appointed by the new board for the new metropolitan police district,* upon their number being fixed by the supervisors, would be new officers, and their offices new offices, but I do not see that such concession would affect the view I have taken of the main question in this case.

Judgment for the relator, and directing a mandamus to issue, as prayed for.

[NEW YORK GENERAL TERM, February 1, 1858. *Davies, Clerke* and *Sutherland,* Justices.]